IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-CT-3116-M

PATRICK RYAN MCGRAW,                )
                                    )
            Plaintiff,              )
                                    )
      v.                            )                    ORDER
                                    )
N.C. DEPARTMENT OF                  )
CORRECTIONS,                        )
                                    )
            Defendant.              )

This cause is before the court on defendants' motions for summary judgment, Mot. [D.E. 49],

and to seal documents, Mot. [D.E. 74]. For the following reasons, the court GRANTS the motions.

Relevant Procedural History:

On April 25, 2019, plaintiff Patrick Ryan McGraw, then a state inmate, filed *pro se* a complaint

under 42 U.S.C. § 1983 as to claims arising at Tabor C.I. circa April 28, 2016. Compl. [D.E. 1].

On October 24, 2019, plaintiff filed *pro se* an amended complaint. Am. Compl. [D.E. 7].

On November 5, 2019, the court allowed the action to proceed against Tabor C.I. nurses

Theresa Gore and Nancy Wargas but dismissed without prejudice other defendants. Order [D.E. 8].

On January 8, 2020, this case was reassigned to the undersigned judge via a text order.

On January 9, 2020, summonses issued as to Gore and Wargas. See [D.E. 10, 11].

On February 14, 2020, summons was returned executed as to Wargas. [D.E. 12].

On February 24, 2020, Wargas moved to dismiss. See Mot. [D.E. 13]; Mem. [D.E. 14].

On March 16, 2020, plaintiff, now represented by counsel, moved for an extension of time to

respond to the motion to dismiss, Mot. [D.E. 17]. The court granted this motion. Order [D.E. 19].

The court notified plaintiff that summons was returned unexecuted as to Gore. [D.E. 21, 22].

Plaintiff timely filed a response in opposition to Wargas' motion to dismiss [D.E. 23], and a memorandum in support [D.E. 24], and then filed a response to the court's notice as to Gore [D.E. 25].

On September 21, 2020, the court granted Wargas' motion to dismiss the action as time barred, dismissed the action against Gore as time barred, and entered judgment. Order [D.E. 27]; J. [D.E. 28].

On April 19, 2022, the United States Court of Appeals for the Fourth Circuit vacated the court's order and judgment and remanded for further proceedings. See Op. [D.E. 33]; J. [D.E. 34].

On May 19, 2022, the court, *inter alia*, directed the clerk to reopen the case, found good cause shown for plaintiff's failure to serve Gore, directed the clerk to provide plaintiff's counsel access to Gore's address under seal, and allowed plaintiff an extension of time to serve Gore. Order [D.E. 36].

On June 8, 2022, Gore and Wargas (collectively, "defendants"), filed an answer. [D.E. 39].

On July 13, 2023, defendants filed, *inter alia*, a motion for summary judgment, Mot. [D.E. 49], a supporting memorandum [D.E. 50], a statement of facts [D.E. 51], and an appendix [D.E. 52].

On September 15, 2023, plaintiff filed a response in opposition [D.E. 61], a statement of facts [D.E. 62], and an appendix [D.E. 63]. Plaintiff later filed a memorandum. See [D.E. 70].

On November 8, 2023, defendants filed a proposed sealed reply. [D.E. 73]; Mot. [D.E. 74].[1]

Facts:

In April 2016, plaintiff became ill at Tabor C.I. Gore evaluated him on April 18, 2016, and thought he had a cold, but the parties dispute, *inter alia*, the thoroughness of the evaluation.[2] Compare Pl.'s Stmt. Mat. Facts. [D.E. 62] at ¶¶8–12; with Defs.' Stmt. Mat. Facts. [D.E. 51] at ¶¶8–12.

---

[1] Because plaintiff has not objected, and because the interest in preserving confidentiality of the included medical records outweighs the public interest in disclosure, the court GRANTS defendants' motion to seal [D.E. 74].

[2] Plaintiff avers, *inter alia*: he believes he encountered some organism that made him feel unwell while doing weed-eating work in a swampy area near Tabor C.I.; shortly after, he "fell ill with a respiratory infection" that "did have some symptoms of the common cold, like a cough, fever, and general malaise," but he "also felt a burning sensation in [his] lungs that began near [his] back and expanded to the front of [his] chest"; "It felt like it was burning a hole in [his] chest"; despite submitting a sick call request, he did not see the nurse for days; he had to submit an emergency sick call request; and the nurse "treated [him] as if [he] just had a cold." Pl. App., Ex. 1, McGraw Aff. [D.E. 63-1] at ¶¶2–6; see Defs.' App., Ex. B, [D.E. 52-1] at 16–18 (Apr. 18, 2016, clinical encounter with Gore, pursuant to a self-declared emergency, assessing "cold symptoms" and listing, as to disposition, "follow up at sick call as needed").

2

At an April 21, 2016, clinical encounter, Gore advised plaintiff to stop smoking, increase his water intake, and take prescribed medications, but the parties dispute whether this was a follow-up appointment, the severity of his symptoms, and whether his treatment was appropriate.[3] Compare Pl.'s Stmt. Mat. Facts. [D.E. 62] at ¶¶13–16; with Defs.' Stmt. Mat. Facts. [D.E. 51] at ¶¶13–16.

Plaintiff next had a clinical encounter with Wargas pursuant to an April 22, 2016, emergency sick call request, but the parties again dispute whether his treatment was appropriate.[4] Compare Pl.'s Stmt. Mat. Facts. [D.E. 62] at ¶¶17–19; with Defs.' Stmt. Mat. Facts. [D.E. 51] at ¶¶17–19.

At an April 27, 2016, clinical encounter, Gore noted plaintiff's symptoms had worsened and referred him to Physician's Assistant ("PA") Kimberly C. Wynn who saw him later that day.[5] Compare Pl.'s Stmt. Mat. Facts. [D.E. 62] at ¶¶20–22; with Defs.' Stmt. Mat. Facts. [D.E. 51] at ¶¶20–22.

---

[3] Plaintiff avers, inter alia: he returned to see the nurse several days later; he explained he did not have an ordinary cold, but "she still treated it as a cold"; the nurse gave him cough syrup and ibuprofen; his worst symptoms had abated but he reported them; and he took the medicines given, but they did not provide relief and his condition worsened. Pl. App., Ex. 1, McGraw Aff. [D.E. 63-1] at ¶¶7–8; see Defs.' App., Ex. B, [D.E. 52-1] at 19–21 (Apr. 21, 2016, clinical encounter with Gore noting: as chief complaint, "cold or flu symptoms" and follow-up "from previous self-declared emergency for cold symptoms"; assessing, "impaired comfort related to cold symptoms"; prescribing phenylephrine and guaifenesin; as to disposition, "follow up at sick call as needed"; and, as to "patient education," "Stop smoking, increase water intake and take medications as instructed. Continue with Ibuprofen you already have.").

[4] Plaintiff avers, inter alia: he put in another emergency sick call request; he condition worsened; he "could barely get out of bed" and "had to lie down on the sidewalk"; the next day, he "asked for antibiotics, but the nurse refused"; he "asked to see a doctor, but the nurse refused to schedule [him] to see anyone else"; and he was told to gargle with salt water but was not provided any salt. Pl. App., Ex. 1, McGraw Aff. [D.E. 63-1] at ¶¶8–10; see Defs.' App., Ex. B, [D.E. 52-1] at 22–24 (Apr. 22, 2016, clinical encounter with Wargas noting: as subjective complaint, "complaining of flu symptoms cough aches and pains and chills. Felt 'shaky' earlier today. He has consumed guaifenesin issued 4/21 and states he has taken all meds that had been issued"; assessing, "cold/flulike symptoms"; as to disposition, "follow-up at sick call as needed"; and, in "other," "reports cold/flu like symptoms . . . Encouraged flu/colds do not respond to antibiotics to increase [his] fluids[,] refrain from smoking[,] may use warm gargles salted rtc [sic] as needed. He expressed understanding and agreement with plan and satisfaction with this nursing encounter").

[5] Plaintiff avers, inter alia: his condition worsened; "several days later, [he] got back in to see the nurse"; "[t]his was several weeks after [he] first started feeling sick from the weed-eating exposure"; the nurse finally let him see the PA; and his "understanding is that the PA diagnosed [him] with pneumonia and sent [him] for a chest x-ray." Pl. App., Ex. 1, McGraw Aff. [D.E. 63-1] at ¶¶11–12; see Defs.' App., Ex. B, [D.E. 52-1] at 25–27 (Apr. 27, 2016, 7:15 a.m. Gore clinical encounter noting: as chief complaint, "cold or flu symptoms"; assessing, "impaired comfort related to continue[d] cough and cold symptoms"; and, as to disposition, "referred to provider for further evaluation"); id. at 29–32 (Apr. 27, 2016, 5:12 p.m. PA Wynn clinical encounter, noting: as chief complaint, "cold or flu symptoms"; as subjective complaint, "36 year old male is here to be evaluated for back pain, cough, weakness, headache, fever, chills for over 1 week"; diagnosing "malaise and fatigue," "acute upper respiratory infection, unspecified," and "Myalgia"; prescribing amoxicillin for "unspecified acute upper respiratory infection"; as to "other," "telephone consult to Dr. Bell about additional recommendations for this patient"; and, as to "patient education," "discussed the addition of the antibiotic and patient to follow up if he gets worse, and encouraged him to drink fluids and stay hydrated.").

3

On April 28, 2016, plaintiff underwent a chest x-ray at Columbus Hospital, Gore told PA Wynn when the x-ray results arrived and that plaintiff "appeared very ill," PA Wynn diagnosed plaintiff with pneumonia, and plaintiff then was admitted for inpatient treatment at Columbus Hospital.[6]  Compare Pl.'s Stmt. Mat. Facts. [D.E. 62] at ¶¶23–25; with Defs.' Stmt. Mat. Facts. [D.E. 51] at ¶¶23–25.

The parties agree that, between April 28, 2016, and his release from state custody circa August 11, 2016, plaintiff received medical treatment at Columbus Hospital, Central Prison Medical Facility, Rex Hospital, and UNC Hospital in Chapel Hill, and that it was determined that he suffered from an infection that went from his lungs to his brain that required removal of a lobe of his right lung and surgery to remove brain tissue, but the parties disagree whether plaintiff "bounced around" to different hospitals, whether doctors "struggled to diagnose" the cause of his pneumonia, and whether the earlier medical care he received at Tabor C.I. was constitutionally inadequate.[7]  Compare Pl.'s Stmt. Mat. Facts. [D.E. 62] at ¶¶2, 26–30; with Defs.' Stmt. Mat. Facts. [D.E. 51] at ¶¶2, 26–31.

Legal Standard:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

_____

[6] Plaintiff avers, *inter alia*, Tabor C.I. medical staff sent him to Columbus Hospital for an x-ray that "showed a mass in [his] lung and lesions in [his] lung and brain [sic]."  Pl. App., Ex. 1, McGraw Aff. [D.E. 63-1] at ¶12; see Defs.' App., Ex. B, [D.E. 52-1] at 33 (Apr. 28, 2016, clinical encounter with Gore noting, *inter alia*, plaintiff returned from outpatient chest x-ray); id. at 34 (Apr. 28, 2016, PA Wynn administrative note, recording, *inter alia*: Gore informed Wynn that plaintiff was "very ill appearing" and had no appetite; the x-ray revealed "mild cardiomegaly and a masslike density in the right upper lobe" that may be "related to pneumonia"; and that hospital admission was recommended).

[7] Plaintiff avers, *inter alia*: once he was discharged from Columbus Hospital, he did not return to Tabor C.I. but was sent to Central Prison Medical Facility; he "was diagnosed with chronic pneumonia"; his condition continued to worsen; he began having seizures and was sent to Rex Hospital in Raleigh; Rex Hospital then sent him to UNC Hospital in Chapel Hill where "they removed the upper part of [his] right lung, and found many lesions on [his] brain where the infection had migrated from the lung and crossed the barrier to infect [his] brain [sic]"; "the physicians at Chapel Hill also performed a craniotomy and removed tissue from [his] brain"; and that the "portion of his skull that was removed is still unstable and moves if it is touched."  Pl. App., Ex. 1, McGraw Aff. [D.E. 63-1] at ¶¶12–13; see also Defs.' App., Ex. B, [D.E. 52-1] at 38–61; Defs.' Reply Attach. [D.E. 73-1] at 1–11 (reflecting plaintiff received medical treatments or had clinical encounters: at Columbus Hospital between circa Apr. 28 to May 6, 2016; at Central Prison Inpatient Medical between circa May 10 and May 13, 2016; at UNC Hospital between circa May 18 and June 10, 2016; and at Central Prison Inpatient Medical between circa June 11 and July 22, 2016).

4

247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Discussion:

Defendants plead and argue, *inter alia*, that plaintiff failed to exhaust available administrative remedies before filing this action. See Answer [D.E. 39] at 3; Pl.'s Mem. [D.E. 50] at 7–9.

In response, plaintiff generally argues that administrative remedies were "unavailable" to him. See Pl.'s Mem. [D.E. 70] at 6–12.

Plaintiff first argues that the Prison Litigation Reform Act ("PLRA") does not apply in this case because 1) he did not meet the definition of a prisoner once he was released from state custody circa August 11, 2016, and 2) defendants "have not submitted any proof to show that the grievance process remained available to Plaintiff after Plaintiff was released from prison in 2016." Id. at 7 (citing Glover v. Young, No. 3:10-CV-523-RJC, 2011 WL 3476429, at *1–3 (W.D.N.C. Aug. 9, 2011)).

Next, plaintiff argues that "through no fault of his own," he "was unable to complete any grievance process because he was released from prison and remained out of prison for almost two years before returning to prison and filing this lawsuit." Id. at 8 (citing Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008)). Plaintiff reiterates that "there is no proof that the administrative remedies

5

remained available to Plaintiff after his release" circa August 11, 2016. Id. at 8–9. Plaintiff also contends that: he "was too ill to pursue any additional administrative remedies, after submitting sick call requests and emergency medical requests before he was finally transferred to outside medical for treatment"; he "was too ill to return to Tabor [C.I.] following his admission to Columbus [Hospital], and he was transferred to Central Prison medical unit directly from Columbus [Hospital]"; he "did not return to Tabor [C.I.] and had no opportunity to submit any grievance at Tabor [C.I.], as is required by" the Department of Public Safety ("DPS") Administrative Remedy Procedure ("ARP"); and "Plaintiff's difficulty with reading and writing, which were exacerbated by his illness due to the delay in medical care, rendered any other administrative remedy procedure unavailable to him." Id. at 9.

Plaintiff next argues that the DPS ARP "falls within the category of 'so opaque that it becomes, practically speaking, incapable of use' due to the circumstances of plaintiff's illness that render application of this procedure especially confusing, even for experienced counsel." Id. (quoting, presumably, Ross v. Blake, 578 U.S. 632, 643 (2016) ("Ross")). Plaintiff contends that, by submitting regular and emergency sick call requests, he "attempted to achieve the purpose" of the ARP, but he became extremely ill, and was referred for outside medical treatment, which was the "only relief available to him," but which "did not, and could not address the previous denial of medical attention which he requested, which is the subject matter of this civil action [sic]." Id. at 10.

Plaintiff argues that the ARP provisions addressing transfers "presupposes that the inmate has already submitted a grievance at the facility where the violation of rights occurred and does not apply to" his situation. Id. at 11. Rather, he asserts, "plaintiff did not have an opportunity to file a grievance" at Tabor C.I. before his transfers to Columbus Hospital, Central Prison, and UNC Hospital. Id.

Plaintiff contends that he was "released from prison in August 2016 shortly after he was discharged from UNC Hospital," and that, after his release from prison, administrative remedies were no longer available to him. Id. at 11–12. Plaintiff further states:

> Apparently, Defendants contend that [plaintiff] is required to rise out of intensive care after having a lung lobectomy and craniotomy, perceive that he would need to file a grievance if he ever wished to file a civil action even though his cognitive abilities were severely compromised following brain surgery, find some way to communicate to some person in the hospital when he was unable to talk, recall that a grievance policy existed at Tabor [C.I.] where he was no longer assigned, obtain forms from Tabor [C.I.] while he was in intensive care, get the forms filled out and filed, and attend to a multi-step grievance procedure at a distance of hundreds of miles away on his sickbed [sic].

Id. at 12.

In reply, defendants argue, *inter alia*: administrative remedies were available to plaintiff; his claims stem from Tabor C.I. medical treatment prior to April 27, 2016; under the ARP, a grievance may be rejected if filed more than 90 days after the event and the submission of the grievance such that he had until July 27, 2016, to submit a grievance; plaintiff was still a prisoner within the time when the 90-day period expired; the PLRA applies because plaintiff also was a prisoner when he filed suit; plaintiff's transfer from Tabor C.I. to Central Prison did not prevent the processing of a grievance of claims arising at Tabor C.I.; and medical records reflect plaintiff was released from UNC Hospital on June 10, 2016, and that, thereafter, he was not too ill to initiate the ARP. See Defs.' Reply [D.E. 73].

The PLRA provides, *inter alia*: "No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see Booth v. Churner, 532 U.S. 731, 741 (2001) (holding exhaustion under the PLRA is required "regardless of the relief offered through administrative procedures"). Successful exhaustion of administrative remedies under the PLRA "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Woodford v. Ngo, 548 U.S. 81, 90 (2006) (citation, alteration, and quotation marks omitted).

"The only exception to the PLRA's exhaustion requirement is when an administrative remedy is not 'available.'" Williams v. Carvajal, 63 F.4th 279, 285 (4th Cir. 2023) (quoting Ross, 578 U.S. at 642). Administrative procedure is not considered "available" when: (1) it "operates as a simple dead end-with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross, 578 U.S. at 643–44 (citations omitted); see Moore, 517 F.3d at 725 ("[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it.").

A plaintiff's failure to exhaust administrative remedies is an affirmative defense that generally must be pleaded and proved. See Jones, 549 U.S. at 216; Wilcox v. Brown, 877 F.3d 161, 167 (4th Cir. 2017); Custis v. Davis, 851 F.3d 358, 361 (4th Cir. 2017). When an inmate files suit prior to exhausting his administrative remedies, courts typically dismiss the action without prejudice. See Ford v. Johnson, 362 F.3d 395, 398, 401 (7th Cir. 2004).

The DPS has a three-step ARP for resolving prison grievances. See Moore, 517 F.3d at 721–22; see also Harris v. Midford, No. 1:10-CV-263-RJC, 2011 WL 1601446, at *2 (W.D.N.C. Apr. 27, 2011) ("North Carolina prisoners can satisfy the [PLRA's] exhaustion requirement by completing all three of the steps of the inmate grievance process, which culminates in the rendering of a decision upon the prisoner's appeal by the North Carolina Inmate Grievance Resolution Board.").

The DPS ARP first encourages informal resolution. See Defs.' App., Ex. E, [D.E. 52-1] at 67 (ARP § .0301(a)).[8] If informal resolution is unsuccessful, the "inmate may submit a written grievance on Form DC-410." Id. at 73 (ARP § .0310(a)(1)). "[A]ny inmate in the custody of the DPS may submit a written grievance on Form DC-410." Id. at 69 (ARP § .0304(a)). Within three days of such

---

[8] The ARP is available at https://files.nc.gov/ncdps/div/Prisons/Policy_Procedure_Manual/G.0300_08_01_13.pdf (last visited Feb. 23, 2024).

submission, a screening officer reviews the Step One grievance to "decide whether it should be accepted, rejected, or returned." Id. at 73 (ARP § .0310(a)(4)). If unsatisfied with the screening officer's Step One decision, the inmate may request relief from the Facility Head ("Step Two"). Id. at 74 (ARP § .0310(b)(1)). If unsatisfied with the Facility Head's decision, the inmate may appeal the grievance to the Secretary of Public Safety through the inmate grievance examiner ("Step Three"). Id. at 75 (ARP § .0310(c)(1)). "The decision by the [Inmate Grievance Examiner] or a modification by the Secretary of Public Safety shall constitute the final step of the Administrative Remedy Procedure." Id. (ARP § .0310(c)(6)). The ARP also provides, in relevant part, that "a grievance may be rejected at any level if," among other things, "[t]here has been a time lapse of more than ninety (90) days between the event and the submission of the grievance." Id. at 70 (ARP § .0306(c)(2)).

First, the court considers plaintiff's contention that the PLRA did not apply. The record reflects that plaintiff was in DPS custody in two relevant time periods – first, between December 8, 2015, and August 11, 2016, pursuant to December 8, 2015, convictions in Surry County, and second, between March 28, 2018, and June 12, 2019, pursuant to a March 28, 2018, conviction in Stokes County. See Defs.' App., Ex. A, [D.E. 52-1] at 3–4. Because this action concerns purported constitutionally inadequate medical care provided by defendants at Tabor C.I. on or before April 27, 2016, during the first relevant period of incarceration, and because it is undisputed that plaintiff was serving a sentence on a criminal conviction when this action was filed during the second period of incarceration, the PLRA plainly applies. See Porter, 534 U.S. at 532; Compl. [D.E. 1] at 11 (dated Apr. 21, 2019); cf. Michau v. Charleston Cnty., S.C., 434 F.3d 725, 727 (4th Cir. 2006) (holding, although the plaintiff "would have qualified as a 'prisoner' under the PLRA while he was serving the sentences on criminal convictions," he was no longer a "prisoner" because he filed suit when he was being civilly detained).

Next, the court considers plaintiff's attempted reliance on Glover, No. 3:10-CV-523-RJC, 2011 WL 3476429, at *1 (W.D.N.C. Aug. 9, 2011). The Glover defendant moved for judgment on the

9

pleadings, arguing that the plaintiff had failed to exhaust his available administrative remedies. Id. The district court found the plaintiff's Step-1 grievance did not receive timely response from prison officials and should have automatically been forwarded to Step-2 review under the ARP. Id. at *2. The district court noted the plaintiff was released from state custody and transferred to a county jail before the Step-1 review was complete and found that, under the ARP, if an inmate is released "prior to completion of the three-step grievance review process, review is completed at the current step, and the grievance process is considered complete." Id. at *3. The district court further found that "[n]othing in the pleadings indicates that [ ] administrative remedies remained available to Plaintiff after his release from [state custody]." Id. Accordingly, the district court concluded that the defendant had failed to plead and prove the plaintiff's failure to exhaust available administrative remedies. Id.

Here, the instant claims arose on or before April 27, 2016, Defs.' App., Ex. B, [D.E. 52-1] at 6–34, and the 90-day period for timely filing a grievance under the ARP expired before plaintiff was released from state custody circa August 11, 2017, id., Ex. E, [D.E. 52-1] at 70 (ARP § .0306(c)(2)); id., Ex. A, [D.E. 52-1] at 3–4. Unlike in Glover, plaintiff does not assert, and the record does not demonstrate, that he initiated a Step-1 grievance as to his instant claims before his release from state custody for this first relevant period of incarceration. Thus, plaintiff's attempted reliance on Glover is inapt. See Woodford, 548 U.S. at 90–91 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."); Moore, 517 F.3d at 725 (noting, "a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are," (citations omitted)).

Plaintiff also does not assert, and the record does not demonstrate, that he exhausted the ARP as to his instant claims after he returned to DPS custody in his second relevant period of incarceration. See Defs.' App., Ex. A, [D.E. 52-1] at 3–4; Pl.'s Mem. [D.E. 70] at 7 (indicating he was reincarcerated

10

Apr. 13, 2019, and filed his complaint on Apr. 21, 2019). Rather, on the face of the initial complaint, plaintiff marked that the grievance process as to the facts alleged was incomplete and he wrote, "grievance process will be completed after this litigation is complete [sic]." Compl. [D.E. 1] at 9.

Next, the court considers plaintiff's contentions that the ARP was "unavailable" due to his transfer from Tabor C.I., the severity of his illness, and his release from DPS custody circa August 11, 2016, "shortly after he was discharged from UNC Hospital [sic]." See Pl.'s Mem. [D.E. 70] at 8–12.

As noted above, the record reflects that, after relevant clinical encounters with defendants at Tabor C.I. from April 18 to April 28, 2016, plaintiff was transferred for inpatient treatment at Columbus Hospital. See Defs.' App., Ex. B, [D.E. 52-1] at 6–34. The record also reflects he was treated at Columbus Hospital from April 28 to May 6, 2016, and then was treated inpatient at Central Prison Medical Facility circa between May 10 and May 13, 2016. See id. at 38–50. Plaintiff avers that, after he suffered seizures at Central Prison, he was transferred to Rex Hospital Raleigh and then to UNC Hospital in Chapel Hill. See Pl. App., Ex. 1, McGraw Aff. [D.E. 63-1] at ¶¶12–14. The record reflects that plaintiff was at UNC Hospital from May 18 to June 10, 2016, and was admitted to Central Prison Medical Facility on June 10, 2016. See Defs.' App., Ex. B, [D.E. 52-1] at 52, 55. The record also reflects plaintiff's Central Prison Inpatient Medical clinical encounters between June 11 and July 22, 2016. See id. at 56–61; Defs.' Reply Attach. [D.E. 73-1] at 1–11. No record evidence suggests any further out-of-prison hospitalization or transfer before his August 11, 2016, release from state custody. Thus, contra plaintiff's assertion that he was released "shortly after he was discharged from UNC Hospital [sic]," Pl.'s Mem. [D.E. 70] at 11–12, the record instead reflects that he remained in DPS custody approximately 62 days after his movement from UNC Hospital to Central Prison.

Next, although, as plaintiff notes, the ARP specifically addresses inmate transfers that occur after the grievance process is initiated, see Defs.' App., Ex. E, [D.E. 52-1] at 76 (ARP § .0311), the ARP did not preclude him from initiating a grievance as to claims arising at Tabor C.I. after his transfer

11

to Central Prison, see generally id. at 67–77. Plaintiff's purported unawareness that he could initiate a grievance as to his instant claims after this transfer to Central Prison did not render the ARP procedure "unavailable." See Ross, 578 U.S. at 641 ("The PLRA's history (just like its text) thus refutes a 'special circumstances' exception to its rule of exhaustion."); Williams, 63 F.4th at 290 ("Simple unawareness [of an administrative remedy], however, does not rise to the level of unavailability."); see also Custer v. W.V. N. Reg'l Jail, No. CIV.A. 2:08CV54, 2009 WL 1390817, at *6 (N.D.W. Va. May 15, 2009) ("There is simply nothing in the PLRA, or the pertinent caselaw, which supports the plaintiff's assertion that a transfer to another facility necessarily renders his administrative efforts futile.").

Next, although plaintiff contends that he "attempted to achieve the purpose" of the ARP by submitting sick call requests, Pl.'s Mem. [D.E. 70] at 10, such requests do not satisfy the ARP's formal three-step prison grievance procedure, cf. Moore, 517 F.3d at 721–22, and therefore do not satisfy the PLRA's exhaustion requirement, see Woodford, 548 U.S. at 93 (finding "the PLRA exhaustion requirement requires proper exhaustion"); see also Macias v. Zenk, 495 F.3d 37, 44 (2d Cir. 2007) (noting that merely alerting prison officials as to the purported wrong requiring redress is insufficient for exhaustion); Scott v. Kastner-Smith, 298 F. Supp. 3d 545, 552 (W.D.N.Y. 2018) (collecting cases for the proposition that an inmate medical request does not satisfy the PLRA exhaustion requirement).

As to the impact that the severity of his illness had on exhaustion, plaintiff avers, *inter alia*:

> "I was very sick, and was unable to submit a grievance for denial of medical care. I needed help writing, and there was no one available to help me. By the time my condition improved enough for me to attend to paperwork, I had been away from Tabor [C.I.] for a long time, and I had completed my sentence and was released when I was able to live on my own."

Pl. App., Ex. 1, McGraw Aff. [D.E. 63-1] at ¶15.

Despite plaintiff's averment that he was "unable to submit a grievance," the ARP specifically provides: "Any inmate who is incapable of understanding this procedure or completing the grievance form may request assistance. Requested assistance will be provided by staff designated by the Facility

12

head." Defs.' App., Ex. E, [D.E. 52-1] at 67–68 (ARP § .0302(a)(2)). Additionally, the ARP states, *inter alia*: "A copy of the Administrative Remedy Procedure shall be readily available to all inmates and staff for their information and reviews [sic]. It shall be posted in conspicuous locations throughout the facility and shall be kept current in all libraries." Id. at 68 (ARP § .0302(b)(1)). The ARP further provides that: "The procedure shall be available to all inmates, regardless of any disciplinary, classification or other administrative decisions affecting the inmate." Id. (ARP § .0302(b)(2)).

Plaintiff does not assert, and the record does not demonstrate, that he requested assistance submitting a grievance as to his claims, that the ARP was inaccessible at Central Prison Hospital, or that he sought, but was denied, required grievance forms. Cf. Edmondson v. Spencer, No. 1:11CV179, 2012 WL 6878906, at *3 (N.D.W. Va. Nov. 26, 2012), report and recommendation adopted sub nom. Edmonson v. Spencer, No. 1:11CV179, 2013 WL 203610 (N.D.W. Va. Jan. 17, 2013). Moreover, plaintiff's purported unawareness of either ARP availability at Central Prison Hospital or the prospect of requesting assistance with completing DPS grievance forms does not amount to "unavailability." See Williams, 63 F.4th at 290. Despite plaintiff's illness and his counsel's asserted confusion, the operation of the ARP, in this case, is not "so opaque that it becomes, practically speaking, incapable of use." Ross, 578 U.S. at 643–44; cf. Griffin v. Bryant, 56 F.4th 328, 338 (4th Cir. 2022).

Next, contra plaintiff's claim that he was too ill to submit a grievance in his first relevant period of incarceration, the record instead reflects, both within the 90-day period for timely filing a grievance as to the instant claims arising on or before April 27, 2016, see Defs.' App., Ex. E, [D.E. 52-1] at 70 (ARP § .0306(c)(2)), and before his release from state custody circa August 11, 2016, see id., Ex. A, [D.E. 52-1] at 4, a date approximately 62 days after he was moved to Central Prison, he was no longer so ill that the grievance procedure was rendered wholly unavailable, see id., Ex. B, [D.E. 52-1] at 52 (June 10, 2016, Central Prison Clinical Encounter noting: on neurological exam, "some memory deficits noted, calm, cooperative, knows president, city, what he had for breakfast"); id. at 56–58 (June

13

11, 2016, Central Prison Clinical Encounter noting: as subjective complaint, plaintiff "reports feeling well"; and, on exam, "appears well, alert and oriented to time, place, and person"); id. at 59–61 (June 14, 2016, Central Prison Clinical Encounter noting: as subjective complaint, "Since transfer back to CP hospital 6/10, patient reports he feels 'great considering how poorly he felt previously. Denies any fever, chills, sweats, reports minimal pain at site of chest incision, none elsewhere. Denies cough, dyspnea, HA, neurologic symptoms"; on neurological exam, "fully alert and oriented, speech fluid and logical. Answers questions appropriately"; and, as assessment, "Abscess of lung with pneumonia [ ] – current, temporary/acute, marked improvement"); see also Defs.' Reply Attach. [D.E. 73-1] at 1–3 (June 27, 2016, Central Prison Clinical Encounter noting: as subjective complaint, "no complaints"; on neurological exam, normal motor system and coordination; on mental health exam, appropriate grooming, normal, appropriate affect, appropriate speech/language, and appropriate mood; and, as an assessment, "alert and oriented x4, able to voice needs appropriately. . . . Ambulates in room without help. . . . Independent and self care. No distress noted."); id. at 4–7 (July 11, 2016, Central Prison Clinical Encounter noting: as subjective complaint, "patient denies complaints"; on exam, "alert and oriented to time, place, and person"; on neurological exam, normal motor system and coordination; on mental health exam, appropriate grooming, normal, appropriate affect, appropriate speech/language, and appropriate mood; and, as to assessment, "Impaired comfort[.] Patient observed sitting on side of bed awake; alert and oriented x4. No acute distress noted. Respirations even and unlabored. . . . Patient asked writer if drinking too many sodas and eating an entire bag of Shabang [sic] potato chips everyday would cause him to have high blood pressure. Writer educated patient on daily sodium intake and hypertension."); id. at 8–11 (July 22, 2016, Central Prison Clinical Encounter noting: as chief complaint, "No complaint(s)"; on neurological examination, normal motor system and coordination; on mental health examination, appropriate grooming, normal, appropriate affect, appropriate speech/language, and appropriate mood; and, as an assessment, "No Significant Findings/No Apparent

14

Distress . . . . He denies being in pain and discomfort. He stands at the door most of the time yelling and talking to the other inmates. Inmate encouraged to use the incentive spirometer at bedside.").

To the extent plaintiff instead contends that he was wholly unaware of the ARP, this claim is belied by his February 2016 successful Step-3 exhaustion of a grievance at Tabor C.I. seeking a Catholic Mass and a prison transfer. See Defs.' App., Ex. F, [D.E. 52-1] at 78–81. Moreover, as noted above, such simple unawareness does not amount to "unavailability." See Williams, 63 F.4th at 290.

In sum, plaintiff fails to show that the ARP amounted to a "dead end" or an opacity, or that any "machination, misrepresentation, or intimidation" prevented him from availing himself of grievance procedure. Ross, 578 U.S. at 642–44; see Moss v. Harwood, 19 F.4th 614, 621–23 (4th Cir. 2021); Moore, 517 F.3d at 725; see also Rinaldi v. United States, 904 F.3d 257, 268 (3d Cir. 2018) ("The burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant. But once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." (internal citations omitted)); Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir. 2014) (holding, if a defendant shows a prisoner did not use available administrative remedies, the burden "shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him"); Tuckel v. Grover, 660 F.3d 1249, 1254 (10th Cir. 2011) ("Once a defendant proves that a plaintiff failed to exhaust, however, the onus falls on the plaintiff to show that remedies were unavailable to him as a result of intimidation by prison officials."); Graham v. Gentry, 413 Fed. App'x 660, 663 (4th Cir. 2011) (per curiam) (unpublished) (noting plaintiff bears the burden of adducing facts showing he was prevented from accessing the procedure such that administrative remedies were unavailable (citing Moore, 517 F.3d at 725)); cf. Kaba v. Stepp, 458 F.3d 678, 685 (7th Cir. 2006); Hill v. O'Brien, 387 F. App'x 396, 401 (4th Cir. 2010) (per curiam) (unpublished); Hill v. Haynes, 380 F. App'x 268, 273 (4th Cir. 2010) (per curiam) (unpublished).

15

After considering the record and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, the court finds that, regardless of the potential merit of plaintiff's claims, defendants have pleaded and proved that he failed to exhaust administrative remedies before filing this action, see Jones, 549 U.S. at 216–17; Wilcox, 877 F.3d at 167, but plaintiff fails to demonstrate that grievance procedure was "unavailable" to him, see Ross, 578 U.S. at 643–44; Moss, 19 F.4th at 623; Moore, 517 F.3d at 725; see also Anderson, 477 U.S. at 252 (noting the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment); Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (noting "neither '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted)).

Defendants have met their burden of demonstrating the absence of a genuine issue of material fact as to exhaustion, Celotex, 477 U.S. at 325, whereas plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted), and defendants are entitled to summary judgment, Anderson, 477 U.S. at 249; see Jones, 549 U.S. at 211; Woodford, 548 U.S. at 85. Accordingly, the court dismisses the action without prejudice, see Booth, 532 U.S. at 735; Ford, 362 F.3d at 401, and need not address defendants' alternative arguments in support of their motion for summary judgment.

## Conclusion:

In sum, the court: GRANTS defendants' motion to seal documents [D.E. 74]; GRANTS defendants' motion for summary judgment [D.E. 49]; and DISMISSES WITHOUT PREJUDICE the action for failure to exhaust available administrative remedies. The clerk shall close the case.

SO ORDERED this 26th day of February, 2024.

RICHARD E. MYERS II
Chief United States District Judge

16